*Buford Twyman, for appellant. H. M. Lane, for appellee.*

---

## J. H. HOLMES & CO. *v.* MORRIS & REID.

**Contract for Sale of Goods—Rescission.**

> The vendor of goods which the buyer refuses to accept according to the terms of his contract may elect to treat the contract as rescinded and the goods as his own and recover the difference between the contract price on the day and at the place of delivery, or he may retain the goods for the vendee and recover the whole price, or he may sell them with due precaution for the account of the vendee and recover the deficit.

**Principal and Agent.**

> A principal in default who refuses when called upon to perform his contract and fails to give directions to his agent as to the disposition he desires to have made of goods in the hands of the agent, cannot be heard to insist that the agent was in default in not doing that which the principal neglected to direct him to do.

APPEAL FROM LOUISVILLE CHANCERY COURT.

September 15, 1876.

OPINION BY JUDGE COFER:

In December, 1870, Fears, Bartly & Co., provision brokers doing business in Louisville, Kentucky, purchased of Beatty, Trobridge & Co., through Morris & Reid, provision brokers doing business in Cincinnati, Ohio, 205,000 pounds clear rib bacon at 11 cents per pound, to be delivered, at buyer's option, in the month of February thereafter, upon fifteen days notice. By the terms of the purchase the buyers were to deposit with the sellers a margin of two cents per pound on the amount of the purchase.

At the time of making the purchase, Morris & Reid, although they knew Fears, Bartly & Co. were brokers, and therefore supposed that they were purchasing for customers, did not know for whom, and therefore must have regarded Fears, Bartly & Co. as their principals. But during the month of February they received information from Fears, Bartly & Co., that 60,000 pounds of their purchase was for account of Joseph Roberts of Macon, Georgia, and requesting them, if convenient, to have the contract of purchase drawn up in his name. That request was complied with, and a written memo-

randum was taken from Beatty, Trobridge & Co., reciting the sale of 60,000 pounds of bacon to Morris & Reid for account of Fears, Bartly & Co., for account of Joseph Roberts. That contract bears date December 21, 1870, and was assigned by Roberts to the appellants, J. Holmes & Co., February 1, 1871.

February 20, Fears, Bartly & Co. wrote to Morris & Reid that Roberts had transferred his contract to J. Holmes & Co., who wished the bacon disposed of as follows: "Ship on the 28th inst. 16,000 lbs.; carry thirty days on above terms 16,000 pounds; carry 60 days on above terms, 28,000 pounds." Morris & Reid wrote to Fears, Bartly & Co., agreeing to the terms proposed, and Fears, Bartly & Co. immediately gave notice thereof to J. Holmes & Co.

Prior to this time and while Morris & Reid were uninformed as to the persons for whom Fears, Bartly & Co. had purchased, Roberts deposited with Fears, Bartly & Co. $1,200, being margin of two cents per pound upon his purchase of 60,000 pounds, and Fears, Bartly & Co. had deposited with Morris & Reid the sum of $4,100, being margin on the purchases made by the latter for the former. But Fears, Bartly & Co. gave no directions to Morris & Reid as to the application of the money, and do not appear to have informed them that any portion of it was to be placed to the credit of Roberts or J. Holmes & Co., or to be applied to that particular contract.

The 16,000 pounds, ordered to be shipped February 28, was shipped to the order of Fears, Bartly & Co., and the invoice and bills of lading were transmitted to them. Fears, Bartly & Co., being then indebted to Morris & Reid, drew upon them for the full price of the shipment for J. Holmes & Co., without deducting anything on account of margin, and Fears, Bartly & Co., drew upon J. Holmes & Co., in the same way, and their draft was paid without complaint or objection.

Morris & Reid, as they had agreed, received the residue of the 60,000 pounds purchase of Roberts to be carried for J. Holmes & Co., and advanced upon it nine cents per pound. At the expiration of the thirty days for which they were to carry 16,000 pounds of that residue, by the orders of Fears, Bartly & Co., they shipped that quantity directly to J. Holmes & Co., and drew upon them for the price and charges, less two cents per pound margin, for which they gave credit. J. Holmes & Co. paid that draft without objection, so far as related to the credits for margin, and Morris & Reid do not seem to have known or to have learned until some time afterward that Fears, Bartly & Co. had not credited the margin on the first

shipment of 16,000 upon their draft upon J. Holmes & Co., on account thereof.

The price of clear rib bacon having declined to about 9¾ cents, Morris & Reid, about the 7th of April, informed J. Holmes & Co. that their margin was exhausted, and called upon them to "put up" an additional margin of one cent per pound on the 28,000 remaining in store and being "carried," and informed them that unless that was done they would sell the bacon. To this J. Holmes & Co. responded, by telegraph, denying that their margin was exhausted, and claiming that they had in the hands of Morris & Reid the sum of $880, that being the residue of the $1,200 deposited by Roberts on the contract, after deducting the sum of $320, credited by Morris & Reid upon the second shipment of 16,000 pounds.

On the 8th, 12th, 14th and 22nd of April, Morris & Reid wrote assigning the sending forward of additional margin. April 12th, J. Holmes & Co. wrote to Morris & Reid, but we do not find the letter in the record. In their answer to that letter dated the 14th, Morris & Reid say they had only received from Fears, Bartly & Co. $560, on account of the bacon.

This, however, is evidently a mistake, if they meant that that was all they had received on the entire lot, for they gave credit on the second shipment of 16,000 pounds for $320, and in this account sales of the remaining 28,000 pounds for $560, making in all $880; and if Fears, Bartly & Co. had given credit on the first shipment, as they should have done, for $320, margin on that lot, the whole amount deposited by Roberts would have been accounted for. J. Holmes & Co. knew they had not received the credit on that shipment to which they were entitled, and the error was subsequently acknowledged by Fears, Bartly & Co. In a letter to J. Holmes & Co., dated April 22, they say: "We telegraphed you today to send draft for margins. * * * Please find our 60 days note, $320, for balance due. Our bookkeeper thought until now that the whole of the $1,200 was placed at Cincinnati. We now discover it was not. We have no money to pay it up." This letter seems to have been read in evidence without objection, and is wholly unexplained, and when considered in connection with the failure of the members of the firm of J. Holmes & Co. to testify in this case, is not without significance.

The margin advanced by Roberts went into the hands of Fears, Bartly & Co. as his agents. It is not shown that it ever went into the hands of Morris & Reid, and if it did, it was placed there with-

out any notice to them that it belonged to Roberts or any one else beside Fears, Bartly & Co.

J. Holmes & Co. do not appear to have replied to the letter purporting to enclose Fears, Bartly & Co.'s note for the deficit. Under the circumstances of the case that letter would seem to demand some explanation. It certainly would have presented Holmes & Co. in a better attitude on the record if they had shown either that that note never came to hand, or if it did, that they had declined to accept and had returned it to the makers.

If they received and kept that note, as from their silence we think we are forced to conclude they did, it is a virtual confession that Morris & Reid have accounted for all the money advanced by Roberts for which they are liable. But aside from that, Fears, Bartley & Co. were the agents of Roberts, and he and his transferee must look to them, unless they can trace the money into the hands of Morris & Reid and show a state of case which made it their duty to hold it as margin on the 60,000 pounds as purchased for Roberts. There is nothing in the record to show that Morris & Reid were under any such duty, and the letter of Fears, Bartly & Co. just referred to tends strongly to show that the money in fact never came to the hands of Morris and Reid at all; and it is entirely certain that if it did, it came to their hands as the money of Fears, Bartly & Co., and not as belonging to Roberts or J. Holmes & Co.

It seems to us, therefore, that, so far as the defense was based on the ground that Morris & Reid had received $1,200 of Roberts's money, and were, on that account, bound to credit J. Holmes & Co. with that amount, the appellants failed to make out their case.

It is next contended that Fears, Bartly & Co. were not the agents of Roberts to make purchases for him, and that they were not the agents of J. Holmes & Co. The exact character of the agreement between Roberts and Fears, Bartly & Co. is not disclosed by the record, and can only be ascertained from circumstances and the course of dealings between them and J. Holmes & Co.

Fears, Bartly & Co. were provision brokers. To buy for customers was a large part of their regular business, and the contract accepted by Roberts, and assigned by him to J. Holmes & Co., shows that they did not sell the bacon, but bought it for account of Roberts. The acceptance of that contract is conclusive evidence that Fears, Bartly & Co. were Roberts's brokers, and as such made the purchase for him, and the conclusion from the fact that his acting in the capacity of broker was acquiesced in is, that they were employed so to act, and

were his agents, and J. Holmes & Co. having taken a transfer of that contract cannot now be heard to say they were not Roberts's agents.

Fears, Bartly & Co. wrote to Morris & Reid informing them what disposition J. Holmes & Co. desired to have made of the bacon. Upon receiving Morris & Reid's answer, accepting the terms proposed, Fears, Bartly & Co. wrote to J. Holmes & Co., under date of February 22, as follows: "Your favor 14th inst. received and noted. We have arranged to have your C. R. bacon carried on the following terms," etc. March 1st, Fears, Bartly & Co. wrote to J. Holmes, enclosing invoice of 44,000 pounds of bacon, which invoice is headed thus:

"Bought by Fears, Bartly & Co., General Brokers. For account of Messrs. J. Holmes & Co., Macon, Ga."

There is other evidence in the record quite as convincing as that cited, but we deem that already adverted to ample to show that Fears, Bartly & Co. were the recognized agents of J. Holmes & Co. after they became the owners of the contract made with Roberts, and that they never regarded Fears, Bartly & Co. in any other light than as their brokers.

It is agreed, however, that Fears, Bartly & Co., and Morris & Reid were partners, and, therefore, whether the margin paid to the former ever came to the hands of the latter so as to charge them on the ground that it was their duty to see to its application as a credit on the price of the bacon or not, they must look to Fears, Bartly & Co., and not to J. Holmes & Co.

There are several satisfactory, and as it seems to us very obvious, answers to this position. In the first place, as we have already seen, Fears, Bartly and Co. failed to credit the price of the first shipment with any part of the margin "put up" by Roberts, but drew for the whole price, which Holmes & Co. paid without objection. They knew what margin had been put up and what credit ought to have been given on that account, and acquiesced, without objection or remonstrance, in that breach of duty on the part of their immediate agents. Morris & Reid were ignorant, so far as this record shows, of the amount of margin received by Fears, Bartly & Co., and were certainly ignorant of their failure to give proper credit therefor on the first shipment.

In the second place, as we have likewise seen, J. Holmes & Co. have received the note of Fears, Bartly & Co. for the deficit they are

now attempting to charge to Morris & Reid, and do not show that they have returned it, or indeed that it has not been collected.

In the third place the agreement made at their instance with Morris & Reid to store and carry the residue of the bacon not shipped February 28th, was a new contract which bound them to pay Morris & Reid in full for the bacon embraced by that contract. They have received credit on the whole of that lot for two cents per pound margin, which is all they pretend to have paid.

The margin they are now contending for should have been credited on the first shipment, and having acquiesced in the failure of Fears, Bartly & Co. to give them a credit at that time they cannot carry it over and charge it to Morris & Reid, who had no connection with or knowledge of that misappropriation, but must pay them according to the terms of the contract to store and carry. Nor can they avoid responsibility on the grounds so plausibly and ingeniously urged by their learned counsel, that this is a case where one has dealt with an agent supposing him to be a principal, and, having discovered him to be but an agent can only charge the principal subject to the principal's equities against the agent. The principle contended for is undoubtedly sound, and is well supported by authority, but it has no application to a case like this.

J. Holmes & Co., with a knowledge that $320 of their margin had been withheld and not credited at the proper time, and without enquiring whether the failure to credit it was caused by Fears, Bartly & Co., or by Morris & Reid, make a new contract with the latter, by which they agree to pay in full for the bacon without giving them notice that they made any claim or would make any that they were entitled to credit for more than the agreed margin of two cents per pound, upon 44,000 lbs., stored and carried under that agreement.

It is finally contended that J. Holmes & Co. refused, as early as April 7, to "put up" any more margin, and that it was the duty of Morris & Reid, as soon as the period for which they had agreed to store and carry the bacon had expired, to sell it, and that if they had done so there would have been no loss, and, therefore, that they cannot recover for a loss which, according to this view, was the result of their own breach of duty. The time for which they undertook to store and carry expired May 1, and if sale had then been made the loss, if anything, would have been less than the sum for which judgment was finally rendered. It is therefore necessary to decide whether it was the duty of Morris & Reid to make sale at once.

It is conceded that J. Holmes & Co. were bound to keep the mar-

gin good. According to the terms of the contract a margin of two cents per pound was agreed upon. Morris & Reid advanced nine cents per pound, which, with the margin, made eleven cents, the purchase price. May 1 the bacon was worth $9\frac{3}{4}$ cents, and it therefore required an additional deposit of $1\frac{1}{4}$ cents per pound to make the margin good, but Morris & Reid only demanded one cent. We have decided that Morris & Reid only had in their hands two cents for each pound they were then storing and carrying, whereas they should have had $3\frac{1}{4}$ cents per pound.

In failing to make their margin good, J. Holmes & Co. violated their contract, and Morris & Reid had a right at once to sell the bacon for their account, and to look to these to make up any deficit that might exist. But the question is, were Morris & Reid bound to sell immediately upon being informed that Holmes & Co. would furnish no more margin?

It is well established that the vendor of goods which the buyer has refused to accept according to the terms of the contract may elect to treat the contract as rescinded and the goods as his own and recover the difference between the contract price and the market price on the day and at the place of delivery, or he may retain the goods for the vendee, and recover the whole price, or he may sell them with due precaution for the account of the vendee and recover the deficit.

Morris & Reid were not vendors, but held the grounds as agent for J. Holmes & Co., subject to their lien for advances and charges, and by the custom of merchants unquestionably had a right to sell within a reasonable time after notice to their principal that they would do so unless the required margin was put up. But will the principal who was in default and who refused when called upon to perform his contract and failed to give directions to his agent as to the disposition which he desired to have made of the goods be heard to insist that the agent was in default in not doing that which the principal neglected to direct him to do? The bacon belonged to J. Holmes & Co.; they knew the time for which Morris & Reid had agreed to carry it had expired; they were repeatedly written to to furnish more margin, which they declined to do; yet they failed to indicate what they desired done. Under such circumstances it seems to us that fair dealing, as well as the custom of merchants, gave Morris & Reid the option to sell the goods at pleasure, provided they acted in that respect in good faith, and to look to their principals for indemnity in case there should be a deficit.

There is no hardship in such a rule, while there might be great in-

justice in the rule contended for by J. Holmes & Co. If the principal fails to direct what disposition the agent shall make of the principal's property in the agent's hands, when he is kept constantly informed of the condition of his property and the circumstances surrounding the agent, upon what principle shall the agent be required to take upon himself the responsibility of acting without instructions? If Holmes & Co. desired to have the bacon sold they should have directed Morris & Reid to sell it. They had no right to lie by in silence so as to remain in a position to take the benefits of an advance in the market without taking the risk of a decline. As long as the bacon remained in the hands of Morris & Reid, Holmes & Co. had a right at any time to pay the advances and charges and claim the property, and if they are right in the position now assumed that it was Morris & Reid's duty to sell the meat as soon as they were informed that no more margin would be advanced, then Holmes & Co. were in a position to claim any advantage from an advance in the market while they could lose nothing in case of a decline.

If there had been an advance they could have paid the amount due and compelled the delivery of the bacon to them, and if a decline occurred they could avoid responsibility by insisting that it was the agent's duty to sell at once, and that, too, when, as we have already decided, the first breach of obligation was by Holmes & Co. The law requires agents to act toward their principals in the utmost good faith, and it equally requires good faith on the part of the principal toward the agent, and will no more sanction a speculation by the principal at the expense of the agent than by the agent at the expense of the principal.

There is no pretense either that Holmes & Co. directed Morris & Reid to sell, or that the latter were guilty of bad faith in not selling earlier; and in any view of the case which we have been able to take we are of the opinion that the judgment is right, and it is therefore *affirmed*.

*J. & J. Cladwell, Buford Twyman, for appellants.*

*J. M. Harlan, for appellees.*

